# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

**LEROY SANDERS**                                                **PLAINTIFF**

**v.**              **Civil No. 04-5163**

**HARTFORD LIFE AND ACCIDENT**
**INSURANCE COMPANY**                                            **DEFENDANT**

## O R D E R

Now on this 28th day of March, 2006, comes on for consideration the captioned matter, the parties having submitted a **Stipulated Administrative Record** (document #8)[1], and briefs in support of their respective positions. From those submissions, the Court finds and orders as follows:

1. Plaintiff, while employed as a truck driver by Wal-Mart Stores, Inc., was insured under group policy GLT 024544 (the "Plan") issued by defendant to Wal-Mart Stores, Inc. The Plan provided benefits for long-term disability. Plaintiff was found eligible for such benefits as of July 21, 1998.

2. The Plan made the following provisions regarding total disability:

> Total Disability or Totally Disabled means that:
>   (1) during the Elimination Period; and
>   (2) for the next 12 months, you are prevented by:
>       (a) accidental bodily injury;
>       (b) sickness;
>       (c) Mental Illness;

---

[1] Plaintiff initially submitted a record of documents he had in his possession (document #4). By Order dated December 9, 2004, the Court directed plaintiff to advise whether the Court needed to give any further consideration to those documents. Plaintiff has not so advised the Court, and it is the Court's understanding that document #8 contains all those records included by plaintiff in document #4. The Court will, therefore, give no further consideration to document #4.

```
          (d) substance abuse; or
          (e) pregnancy,
```
from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

3. On May 12, 1999, plaintiff was notified that effective July 21, 1999, he had to meet the second portion of this definition in order to continue to be eligible for benefits. Translating the second portion into the terms of plaintiff's case, plaintiff would have to show that he was prevented, by accidental bodily injury or sickness, from performing the essential duties of any occupation for which he is qualified by his education, training, or experience.

An investigation was begun by defendant to determine if plaintiff met these criteria.

4. Following its investigation, defendant informed plaintiff on February 19, 2002, that his benefits would cease as of February 20, 2002. The reasons given were:

* that there were no objective findings to support plaintiff's subjective complaints of disability;

* that video surveillance revealed plaintiff engaging in activities which would be impossible for him if he had the subjective limitations he claimed; and

*   that plaintiff had "a relative lack of orthopedic evaluation and treatment given his subjectively high level of disability."

5.  At plaintiff's request, the decision to terminate his benefits was administratively reviewed in conjunction with additional medical information submitted by plaintiff. On January 1, 2003, defendant again informed plaintiff that he was no longer considered totally disabled under the Plan, and that his file would remain closed. The letter informing plaintiff of that decision gave the following reasons:

*   A Physical Capacity Exam in July, 2001, showed that plaintiff could sit for up to four hours, stand for up to two hours, and walk for up to two hours in an eight-hour day.

*   Plaintiff's treating orthopedic physician, Alice Martinson, told a reviewing physician that there were no "truly objective findings" of lateral epicondylitis[2], plaintiff's initial disabling condition, and that he could have surgery for that condition which, if successful, would allow him to return to truck driving, but that plaintiff had not elected to have the surgery.

*   Plaintiff's subjective complaints of disability were

---

[2]Defined in <u>Steadman's Medical Dictionary</u>, 26th Edition, as an infection or inflammation of an epicondyle, the part of a long bone near the joint. A classic example is "tennis elbow." All medical definitions in this Order are taken from <u>Steadman's</u>.

-3-

inconsistent with video surveillance of his actual activities.

* Defendant's reviewing orthopedic physician opined that plaintiff could drive a truck on a full-time basis.

* Defendant's reviewing vascular physician found that plaintiff had had no evaluation or treatment for his alleged vascular problems, and thus there was no evidence to support a disabling vascular condition.

This decision exhausted plaintiff's administrative remedies, and the decision now comes on for judicial review.

6. The parties agree that this claim falls within the purview of the Employee Retirement Income Security Act, **29 U.S. C. §1001 et seq**. ("ERISA"). Where an ERISA plan gives the plan administrator discretion to determine eligibility for benefits, as the Plan herein does, judicial review proceeds on an abuse of discretion standard, and the administrator's decision will be reversed only if it is arbitrary and capricious. **Groves v. Metropolitan Life Insurance Co.**, **438 F.3d 872 (8th Cir. 2006).**

> The contours of such review are by now well settled:
>
> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. A reasonable decision is fact based and supported by substantial evidence. We may consider both the quantity and quality of evidence before a plan administrator. And we should be hesitant to interfere with the administration of an ERISA plan.

**Groves, 438 at 875** (internal citations and quotation marks omitted; emphasis in original).

Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. **Woo v. Deluxe Corp., 144 F.3d 1157 (8th Cir. 1998).** It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Shipley v. Arkansas Blue Cross and Blue Shield, 333 F.3d 898 (8th Cir. 2003)** (quotation marks omitted).

Given this standard, the Court turns to the record to see if there is substantial evidence to support defendant's decision that plaintiff had ceased to be eligible for long-term benefits as of February 20, 2002.

    7.    The Stipulated Administrative Record contains the following medical information relevant to plaintiff's claim:

05/13/98   Clinic Note of Scott Cooper, M.D., an orthopedic surgeon, describing plaintiff's injury (his hand slipped while cranking a crank at work and he slammed his elbow into a trailer). Dr. Cooper found plaintiff to be "exquisitely[3] tender over the lateral epicondyle," and referred him to William Ackerman, M.D., to evaluate him for reflex sympathetic dystrophy ("RSD")[4].

06/03/98   Clinic Note of Dr. Cooper, noting exquisite tenderness over the lateral epicondyle, as well as other symptoms, and pointing out that while "there's no question he has a component of lateral epicondylitis," that "does not explain all of his symptoms." RSD had been ruled out by

---

[3] <u>Steadman's</u> defines "exquisite" as "[e]xtremely intense, keen, sharp; said of pain or tenderness in a part."

[4] <u>Steadman's</u> defines RSD as "diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints; frequently follows some local injury."

            Dr. Ackerman, and Dr. Cooper was comfortable treating plaintiff with injections.

06/17/98    Clinic Note of Dr. Cooper, noting "I think this has all settled down to lateral epicondylitis," and that plaintiff was in physical therapy.

07/01/98    Clinic Note of Dr. Cooper, noting plaintiff was still having pain and tenderness in the lateral epicondyle region.

07/29/98    Clinic Note of Dr. Cooper, noting plaintiff was "exquisitely tender over the lateral epicondyle" and "diffusely tender in the forearm and on the medial side." Dr. Cooper explained to plaintiff that his condition usually gets well "on its own," and surgery is seldom required, but that healing often takes "a good while."

08/26/98    Clinic Note of Dr. Cooper, noting exquisite tenderness over the lateral epicondyle and mild tenderness over the flexor origin at the medial epicondyle. Dr. Cooper notes "Mr. Sanders presents a difficult problem. He doesn't give much evidence in the way of neuropathy, however, it's hard to explain all of his symptoms just from his lateral epicondyle. On the other hand, when we inject his lateral epicondyle, he gets much better."

09/14/98    Clinic Note of Dr. Cooper, noting that he had checked out plaintiff's complaints in a number of ways, that his symptoms "have not all been focused over the lateral epicondyle and I'm not very confident at this point that we could help him with surgery."

10/12/98    Clinic Note of Dr. Cooper, noting that plaintiff does well in physical therapy, but then when he returns to work, he has pain. Dr. Cooper's approach to plaintiff's care was to "keep him working."

11/18/98    Clinic Note of Dr. Cooper, regarding plaintiff's lateral epicondylitis, reporting that valid testing showed plaintiff had "some limitations with grip and pinch, etc." Dr. Cooper explains in this note why he is not comfortable recommending surgery for plaintiff: He's worried that he's going to make things worse by waiting and I've explained to him that's absolutely not the case. If indeed he has lateral epicondylitis, then surgery 6 months from now isn't any different from

surgery now and I don't think it affects his result. I've explained to him that in lateral epicondylitis, we're treating a subjectively painful entity rather than something objective that we can measure and it's something that he needs to hold off on as long as possible as far as considering surgery. . . . I'm not saying that I won't operate on him, but I am saying that it may be absolutely a last resort. The fact remains that he's been doing quite well up until the last 2 or 3 days and if we can get him to the point where he just has a flare up every now and then, he would probably be better off tolerating that than considering surgery. He's not the usual picture with lateral epicondylitis.

01/27/99  Clinic Note of Dr. Cooper, in which he states his conclusion that he has done all he can do for plaintiff. "I finally have come to the conclusion that I really don't think I can help him surgically. I've explained to them in all honesty that they might find another orthopedic surgeon who operates on his lateral epicondylitis and gets him well in which case I will be sorry that I did not do the operation. . . . I can only tell them truthfully that I don't have confidence in my heart and in my gut that I can make him well with an operation and in all honesty, if he's going to hurt, I would rather him hurt without an operation than hurt with an operation. Again, I cannot say for sure that he would not get well with an operation, I just don't have confidence in my abilities. I did not know this, but after I said that, Wendy showed me a letter from Dr. Martinson and her feeling was much the same. Her feeling was that it was not unreasonable to consider surgery but that she did not have any great confidence that he would continue to do well in the occupation that he's in."

02/04/99  Dr. Cooper completed an Attending Physician's Statement of Disability, noting a diagnosis of right lateral epicondylitis, and stating that it was not safe for plaintiff to drive because he "misses gears," that he cannot lift more than ten pounds with his right arm once an hour, and that he cannot use his right arm repetitively.

06/29/99  Dr. Cooper completed an Attending Physician's Statement of Disability, noting a diagnosis of right lateral epicondylitis, which totally disabled plaintiff from driving and from heavy or repetitive use of his right

-7-

|          | arm, but that he was capable of light work if those restrictions were observed. |
|----------|---|
| 10/04/99 | Clinic Note of Dr. Cooper, noting diffuse tenderness of plaintiff's arm and forearm, and describing that "with a great deal of encouragement and a little help," he has flexed the arm fully, and gotten to within a few degrees of full extension. |
| 11/07/00 | Office note of Dan Bell, M.D., reporting plaintiff's complaints of "extreme ankle pain and lower leg pain that appears to be a combination of his joints and his varicose veins." Dr. Bell observed that plaintiff "has rather prominent varicosities with multiple small, tender varicose veins in his instep and ankle, larger varicose veins above," "trace edema," and "clearly arthritic ankles, left greater than right, with crepitus[5] and reduced motion." His assessment was chronic phlebitis[6] with varicosities, and osteoarthritis of both ankles. |
| 01/04/01 | Office note of Dr. Bell, noting "mild varicosities, none inflamed" in the legs, and a "[d]isabling posttraumatic arm condition, stable." |
| 01/24/01 | Office note of Dr. Bell, noting plaintiff "is exquisitely tender in his right lateral epicondyle. His grip is only about 1/3rd of normal." Dr. Bell's assessment is "[r]ight lateral epicondylitis, disabling as he is a truck driver" and "OA [osteoarthritis] of the right shoulder and both ankles." |
| 07/11/01 | Office note of Dr. Bell, noting "obvious exquisitely tender right lateral epicondylitis," and "synovitis[7] and crepitus in his ankles with tenderness in his metatarsals. He has bulky varicose veins in his upper leg and along his feet." Dr. Bell also completed an Attending Physician's Statement of Continued Disability this date. He noted a primary diagnosis of osteoarthritis of the right shoulder, feet and ankles, and a secondary diagnosis of lateral epicondylitis of |

---

[5] Steadman's defines "articular crepitus" as "the grating of a joint."

[6] "Inflammation of a vein."

[7] "Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis."

-8-

the right elbow. He opined that plaintiff could sit for four hours, stand or walk for two hours, and drive for one to two hours in an eight-hour day, but could "never" do any climbing, balancing, stooping, kneeling, crouching, crawling, or reaching, and had no capacity for repetitive use of the right or left foot or the right hand. He stated that plaintiff "continues to be completely disabled," but could return to work if sedentary part-time work was available.

09/05/01   Office note of Dr. Bell, noting tenderness in the epicondyles and shoulders, and visible synovitis in the feet.

12/18/01   Clinic notes of Alice Martinson, M.D., a board certified orthopedic surgeon, noting the continuing problems with plaintiff's right elbow, along with "rather significant hypertrophic osteoarthritis of both feet and ankles and severe venous stasis[8] changes in both lower extremities." Dr. Martinson was "unable to passively dorsiflex[9] either ankle to within ten degrees of the plantigrade[10] position when the knees are extended, and he can only achieve neutral in dorsiflexion with the knees flexed." X-rays of plaintiff's ankles showed large bone spurs on the anterior tibial margins and the talar necks. Dr. Martinson thought that surgery on plaintiff's elbow would be helpful, but that he should not have surgery on his ankles. Her report notes that "[g]iven the severe chronic stasis changes which he has, I have advised him that surgical intervention to remove the large spurs should probably be avoided. I would be concerned about wound healing. He asked me about the advisability of his returning to over-the-road truck driving. Assuming that his elbow surgery is successful - which I think is a reasonable assumption - there would be no reason why he could not return to driving a truck from an upper extremity point of view. His severe chronic venous stasis, however, makes it most unwise for him to return to over-the-road trucking because of the long hours of sitting which that particular job

---

[8]"[C]ongestion and slowing of circulation in veins due to blockage by either obstruction or high pressure in the venous system, usually best seen in the feet and legs."

[9]Turn the foot upward.

[10]"Walking with the entire sole and heel of the foot on the ground, a do man and bears."

-9-

|            | requires."                                                                                                                                                                                                                                                             |
| ---------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| 07/25/02   | Radiology report from William Hicks, M.D., noting minor degenerative changes of the left shoulder, and osteoarthritis of the right elbow with spurs at several locations, including the medial and lateral humeral epicondyles.                                        |
| 08/02/02   | Bone Scan report from Denny Krout, D.O., reporting an impression of "degenerative disease[11]."                                                                                                                                                                         |
| 08/20/02   | Report of Dr. Krout, noting that both of plaintiff's feet showed vascular insufficiency, and stating that plaintiff is "unable to drive truck or work in that field."                                                                                                   |
| 08/27/02   | History and physical of Dennis McClary, D.O., noting that plaintiff has "dependent edema[12] that appears chronic with some venous stasis dermatitis[13]."                                                                                                              |
| 08/28/02   | Report of doppler ultrasound from Jeffrey Smith, D.O., with findings of "augmentation and compression[14]" throughout the area, and an impression of "no evidence of bilateral deep venous thrombosis[15]."                                                             |
| 10/09/02   | Letter from Robert Koch, D.O., stating that he is treating plaintiff for hypertension, degenerative disease of the left shoulder, osteoarthritis of both ankles, and chronic venous stasis of both lower extremities; that the ankles are inoperable due to the venous stasis; and that "it would not be feasible for this individual to resume his long haul truck driving career due to the long hours of sitting." |

---

[11] Osteoarthritis.

[12] A "clinically detectable increase in extracellular fluid volume localized in a dependent area, as of a limb, characterized by swelling or pitting."

[13] Stasis dermatitis is "erythema and scaling of the lower extremities due to impaired venous circulation." Erythema is "redness of the skin due to capillary dilatation."

[14] While "augmentation" is not defined therein, Steadman's defines "compression" as "[a] squeezing together; the exertion of pressure on a body in such a way as to tend to increase its density; the decrease in a dimension of a body under the action of two external forces directed toward one another in the same straight line."

[15] "[C]lotting within a blood vessel which may cause infarction of tissues supplied by the vessel."

8.  The Stipulated Administrative Record also contains a description of the job responsibilities of a Wal-Mart truck driver.  Those responsibilities include driving seventy hours in a seven-day week, climbing in and out of trucks and trailers, and stooping and bending while dollying trailers down or hooking trailers up.

9.  The Stipulated Administrative Record also contains the video footage of surveillance conducted by defendant on plaintiff's activities.

One portion of the video is of someone who clearly is not plaintiff, driving a tractor.

One portion shows plaintiff walking slowly from the front to the side of a house, where he bends down to cut something with a pair of hedge clippers.  This footage lasts about a minute.

One portion shows plaintiff and a woman going into a store.  Plaintiff walks slowly.  He comes back about an hour later with the woman and a cart filled with small plastic bags of items.  He helps the woman put these bags into the back of a vehicle, then they go get a hot dog.

10.  The Stipulated Administrative Record also contains the report of Barry Turner, M.D., who was retained by defendant to review plaintiff's file as of December 18, 2002, with reference to plaintiff's musculoskeletal orthopedic condition only. Dr. Turner was to provide "recommended limits and restrictions associated

with [plaintiff's] orthopedic condition" based on plaintiff's medical records, conversations with plaintiff's treating physicians, and the surveillance videotape. Dr. Turner opined that "from an orthopedic standpoint only, with consideration of his ankle joints, and his right elbow and shoulders, I do not find any reason why he should be incapable of performing his own occupation as a truck driver, full-time from an orthopedic point of view."

11. The Stipulated Administrative Record also contains the report of Willard Johnson, M.D., who was retained by defendant to review plaintiff's file from the standpoint of his vascular condition. Although Dr. Johnson found no vascular diagnostic workup in the records he reviewed, and therefore was unable to determine whether plaintiff's venous stasis was caused by medications, incompetent valves, cirrhosis of the liver, or overweight, and noted that he would defer judgment until such a workup was done, he then volunteered the prognosis that "with proper treatment and compliance by Mr. Sanders I would except [sic] that he could return to long distance truck driving."

12. The Stipulated Administrative Record also contains the report of George Kazda, M.D., defendant's Associate Medical Director, dated February 2, 2002. Dr. Kazda reviewed some of plaintiff's medical records and spoke by phone with Dr. Bell. He opined that it is "more likely than not" that plaintiff "retains

the ability to drive an 18-wheel truck but may require accommodations, like the use of an automatic transmission and, and taking appropriate rest."

13. The Stipulated Administrative Record also contains a section of medical records which were submitted by plaintiff but are said to be challenged by defendant. The nature of this challenge is not fleshed out, but the Court has elected not to include these records in its review, except to the extent that the same records appear in the unchallenged portion of the Stipulated Administrative Record.

14. The Court has carefully reviewed all the foregoing information and concludes that the decision of the Plan administrator is not supported by substantial evidence. This conclusion is based on the following:

(a) All of the evidence from plaintiff's treating physicians is to the effect that he is disabled from returning to his former occupation of long-haul truck driving -- not one disputes this or says otherwise. Their statements of disability relate not only to plaintiff's initial disabling condition, lateral epicondylitis, but to the gradually-worsening condition of his lower extremities due both to osteoarthritis of his ankles and venous insufficiency. Their diagnoses of these conditions are supported not only by plaintiff's subjective complaints, but also by x-rays showing bone spurs in his elbow and ankles, and varicose veins and skin changes

associated with venous stasis that were observed by his treating physicians.

(b) On the other hand, the Court believes the opinions of the reviewing physicians are flawed - each in its own way - but most particularly by failures to consider all of the medical evidence supplied by plaintiff's treating physicians. The opinions of the reviewing physicians - and thus the decision based on them - are undermined by these failures. While an ERISA administrator is not required to credit the opinions of a claimant's treating physicians over other relevant evidence of his medical condition, it cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." **Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)**. In this case, the only medical evidence of plaintiff's condition is found in the records of his treating physicians. The Court sees no evidence to suggest that these records are incredible and not worthy of consideration by a reviewing physician.

Thus, by relying on the opinions of reviewing physicians who failed to credit (or even consider) the opinions of the treating physicians, the Plan Administrator effectively refused to credit plaintiff's reliable evidence.

The fact that such failures are not harmless flaws in the Plan Administrator's decision-making process is demonstrated by

the following:

* Dr. Turner, in forming his opinion that plaintiff could return to his former job driving a truck for Wal-Mart, apparently overlooked the fact that Dr. Bell limited plaintiff's driving to one to two hours in an eight hour day. Plaintiff's work for Wal-Mart required driving ten hours a day, seven days a week.

* Dr. Turner relied on Dr. Kazda's conclusion that plaintiff could return to truck driving with some accommodations. However, it is apparent that this conclusion was reached without full consideration of plaintiff's medical evidence, as noted *infra;*

* Dr. Turner further concluded that there is no credible evidence of lateral epicondylitis -- a conclusion that could only be reached by discrediting two orthopedic surgeons who treated plaintiff for that condition; and

* Dr. Turner also, in the Court's view, overestimated the level of activity reflected in the surveillance videotapes.

* Dr. Johnson's report must be regarded as being flawed because, before offering his opinion, he took pains to explain that he really had no basis upon which to form an opinion.

* Dr. Kazda's opinion must also be regarded flawed because he did not consider (indeed, he may not even have been aware of) Dr. Martinson's clinic notes of December 18, 2001, stating that it would be "most unwise" for plaintiff to return to driving because

of his "severe chronic venous stasis";

* Dr. Kazda opines that "[t]he medical record shows no evidence that Mr. Sanders' shoulder and ankle, osteoarthritis, or his varicose veins would preclude return to his own occupation." This assertion is clearly be at odds with the records of both Dr. Cooper and Dr. Bell - which records were ostensibly reviewed by Dr. Kazda.

(c) In the Court's view, the value of the video surveillance is questionable and cannot be properly regarded as substantial evidence of anything. The hedge-trimming incident, of which so much is made, lasted only about a minute. It shows plaintiff and a woman walking to some shrubs at the side of a house, where plaintiff bends down to trim something with a pair of hedge clippers. Characterizing this activity as being evidence that the plaintiff is "doing yard work" is an overstatement.

The grocery-shopping incident shows plaintiff lifting a few small plastic bags of items out of a shopping cart - bags which could not have weighed more than a few pounds apiece. Again, its import does not appear to carry the weight assigned to it by defendant.

Defendant's file reports this video footage as evidence that plaintiff can "use his right arm" and "be[] on his feet for over an hour," and claims that it calls plaintiff's credibility into question because it is at odds with plaintiff's own statements of

his disabilities. Yet no physician has stated that plaintiff's right arm hangs limp and useless by his side, or that he must use a wheelchair to get around, nor does plaintiff. That is not the issue here. As Dr. Bell noted, the video footage proves plaintiff can unload a few Wal-Mart bags and drive his personal vehicle for short periods. It does not show he can drive an 18-wheeler for ten hours a day, seven days a week.

(d) The Activity Log from defendant's claim file reflects that in early August, 2001, the defendant determined that it would be appropriate to obtain an independent medical examination ("IME") to evaluate plaintiff's vascular problems, and a functional capacity exam to evaluate his arm and leg function. In September, 2001, the Log again notes that "[w]e will have to order an IME to address the varicose vein issue." Yet neither report was obtained.

15. When one considers the flaws in the reports upon which defendant relied to reach its decision to terminate plaintiff's benefits, the conclusion is inescapable that there is no substantial evidence to support the bases for termination stated in defendant's letter of February 19, 2002, or the expanded reasons given when defendant had completed its administrative review on January 1, 2003. That being the case, the decision cannot stand.

16. The proper disposition of this matter has required the

Court to consider the curious fact that defendant did not base its decision to terminate plaintiff's benefits on a claim that he is able to perform the essential duties of any occupation for which he is qualified, but only on a claim that he is able to return to his occupation of truck driving. Perhaps, had defendant come at the termination decision from this perspective, it would have been possible to muster substantial evidence to support termination.

Then again, perhaps it would not have not have been possible. As of the date of the termination notice, plaintiff was 45 years old. He had a ninth-grade education, and had difficulty reading. His work history consisted entirely of manual labor and driving a truck. He had significant impairments to his right arm and to both legs and feet. The Social Security ALJ, relying on the evidence of an impartial vocational expert, found that plaintiff "cannot make an adjustment to any work that exists in significant numbers in the national economy."

Be that as it may, the Court finds that the decision was made entirely on the basis that defendant determined plaintiff could return to driving a truck, which is not supported by substantial evidence. The Court, therefore, concludes that plaintiff's benefits were not properly terminated, and that he is entitled to benefits from February 20, 2002, until the date of this Order, with interest thereon, same to continue from henceforth unless and until a valid determination that he is no longer entitled to

benefits is reached.  The parties are directed to confer and determine the appropriate amount of those back benefits, and so advise the Court within thirty (30) days of the date of this Order, so that judgment for the correct amount may be entered.

17.  Plaintiff prayed in his Complaint for an award of attorney's fees.  ERISA gives the Court discretion to award a reasonable attorney's fee, and costs, **29 U.S.C. §1132(g)(1)**, and the Court finds that plaintiff is entitled to such.  A petition supporting the amount claimed should be filed no later than fourteen (14) days from the date of this Order, with any objection thereto filed within ten (10) days thereafter.

**IT IS THEREFORE ORDERED** that the decision of Hartford Life and Accident Insurance Company to terminate the long-term disability benefits payable to Leroy Sanders under group policy GLT 024544 as of February 20, 2002, is hereby **reversed.**

**IT IS FURTHER ORDERED** that the parties are to confer and determine the appropriate amount of back benefits due to plaintiff, and so advise the Court within thirty (30) days of the date of this Order, so that judgment for the correct amount may be entered.

**IT IS FURTHER ORDERED** that defendant is to reinstate plaintiff's benefits under the Plan as of the date of this Order, and continue paying them henceforth, unless and until a valid determination that he is no longer entitled to benefits is

reached.

**IT IS FURTHER ORDERED** that plaintiff is entitled to recover his reasonable attorney's fees and costs, predicated upon a timely and specific application for same within fourteen (14) days of the date of this Order.

**IT IS SO ORDERED.**

                                         /s/ Jimm Larry Hendren
                                         **JIMM LARRY HENDREN**
                                         **UNITED STATES DISTRICT JUDGE**